EXHIBIT 3

# Table of Contents

**CHAPTER 8**    CHAPTER 8 ............................................................................................. 8-1
HOUSING SEARCH AND LEASING ........................................................................ 8-1
8.1 Chapter Overview .............................................................................................. 8-1
8.2 Briefings ............................................................................................................. 8-1
    Introduction ........................................................................................................ 8-1
    Briefing Topics ................................................................................................... 8-3
    Section 504 Requirements ................................................................................. 8-3
    Other Briefing Topics ......................................................................................... 8-3
    Contents of Briefing Packet .............................................................................. 8-5
    Briefing Attendance, Length, Location, and Time ........................................... 8-8
8.3 Voucher Issuance ............................................................................................ 8-10
    Introduction ...................................................................................................... 8-10
    Overissuance .................................................................................................... 8-11
    When to Issue ................................................................................................... 8-11
8.4 Family Obligations .......................................................................................... 8-11
8.5 Search Time, Extensions, and Voucher Expirations .................................... 8-11
    Extensions of Search Time .............................................................................. 8-12
    Voucher Term Expiration ................................................................................. 8-13
    Suspension of Search Time .............................................................................. 8-13
    Fair Housing Requirements ............................................................................. 8-14
8.6 Assistance to Families During the Housing Search .................................... 8-14
8.7 Request for Tenancy Approval ...................................................................... 8-15
8.8 PHA Approval of the Tenancy ....................................................................... 8-15
    Eligible Units .................................................................................................... 8-16
    Unit Meets HQS ................................................................................................ 8-17
    Rent Reasonableness ........................................................................................ 8-18
    Notification to Owner and Family ................................................................... 8-18
8.9 PHA Disapproval of Owner ........................................................................... 8-18
    Owners Disapproved by HUD .......................................................................... 8-18
    Leases Between Relatives ................................................................................. 8-19
    Conflicts of Interest .......................................................................................... 8-19
    PHA Discretion to Disapprove Owners ........................................................... 8-19
8.10 Tenant Screening ........................................................................................... 8-20
8.11 Lease and Tenancy ........................................................................................ 8-21
8.12 Term of Assisted Tenancy ............................................................................ 8-22
8.13 Maintaining Data on Issuance, Search time and Success Rates ............... 8-22

# CHAPTER 8
# HOUSING SEARCH AND LEASING

## 8.1    CHAPTER OVERVIEW

This chapter explains the briefing process, housing choice voucher issuance, housing search, tenancy approval, and leasing processes.  Housing search and leasing are critical activities in the administration of the housing choice voucher program.  Until the family finds a unit that meets both its needs and program requirements, the family cannot benefit from the many opportunities offered by the housing choice voucher program.  At the same time, the PHA cannot earn the administrative fee needed to operate the program until a unit is leased and under HAP contract.  When a family receives adequate information about program rules and PHA expectations and assistance during the housing search and leasing processes, both the family and PHA benefit.  Families are likely to lease units more quickly and better understand program requirements, while the PHA increases its ability to meet SEMAP leasing requirements, improve its leasing success rate, and control costs.

The voucher is the family's authorization to search for housing.  The family receives it after the PHA selects the family from the waiting list, determines its eligibility for assistance, and conducts the program briefing.  Upon issuance of a housing choice voucher, the housing search process begins.  Once the family finds a suitable unit, the PHA begins its process of approving or denying the assisted tenancy.  If the tenancy is approved, leasing activities begin.

## 8.2    BRIEFINGS

### Introduction

PHAs must orally brief families selected to participate in the housing choice voucher program about program requirements and how the program works.  The briefing must occur prior to issuance of the voucher to the family.

The briefing provides the PHA with a unique and important opportunity to set the tone for the relationship between the PHA and the participating family.  The briefing presentation should be polished, and the message delivered should be clear, consistent, and strong.

The staff person(s) assigned to conduct the briefing should be well-trained in presentation skills.  Some PHAs have found it effective for staff persons who are also housing choice voucher participants to conduct the briefing because they can share their own first-hand experience.  Good presenters know their audience and tailor the presentation to meet its needs.

For example, most families invited to a briefing know very little about the housing choice voucher program.  The complexities of the program should therefore be discussed as simply as possible.  The presentation should also be well-organized to aid the family's understanding and to give the family an opportunity to ask questions, discuss the information being presented, and to ensure that participant rights and responsibilities are clearly understood.  Many presenters find

it helpful to use videos, slide presentations, charts, maps, and other visual and media aids to deliver the message.

---

BRIEFING OBJECTIVES

- Introduce the housing choice voucher program and the benefits it offers participating families;

- Provide step-by-step instructions on how and where to search for a unit;

- Explain how rent and subsidy are calculated;

- Inform families of their rights under the housing choice voucher program;

- Inform families of their responsibilities as housing choice voucher program participants; and

- Clarify the role of the PHA and its expectations of housing choice voucher program participants.

---

Important benefits can be gained by dedicating staff time and resources to this "front-end" process. Families who are not properly briefed often require more assistance from PHA staff in order to find a unit. This can place unnecessarily heavy demands on staff time and affect the agency's ability to achieve its monthly leasing objectives and complete other important processing functions, such as monthly reexaminations. PHAs that are committed to conducting high-quality briefings often find that their ability to efficiently administer the program greatly increases.

Because of the importance of the briefing, PHAs in areas where a large number of applicants do not speak English as their primary language should consider conducting a special briefing in another language or languages, conducting a bilingual briefing, or arranging for an interpreter to be present at the briefing. Similarly, the written material that accompanies the briefing should be translated to the extent possible. PHAs can draw upon the bilingual skills of various community organizations or its own staff to assist in briefing families and translating documents.

Although the briefing presentation and the contents of the information packet are discussed under separate subheadings below, they are very much related in practice. The information packet is typically distributed during the briefing session, and parts of the briefing involve explaining items contained in the information packet.

**Briefing Topics**

Each briefing must provide information on the following subjects:

- How the housing choice voucher program works;

- Family and owner responsibilities; and

- Where the family can lease a unit, including renting a unit inside or outside the PHA's jurisdiction.

For families eligible under portability, the briefing must also include an explanation of portability. The PHA cannot discourage eligible families from moving under portability.

For families living in high-poverty census tracts, the briefing must also identify areas outside of high-poverty concentration and explain the advantages of moving to such areas. (See Chapter 2.*)*

**Section 504 Requirements**

If a person with a disability is to be present at the briefing, the PHA must ensure effective communication in accordance with Section 504 requirements. Section 504 of the Rehabilitation Act of 1973 (as amended) prohibits discrimination under any federally-assisted program solely on the basis of a disability. To assure that housing choice voucher applicants have an opportunity to participate in the program, the briefing site must be accessible to individuals with disabilities, or provisions must be made to brief the individual at an accessible site. The PHA must use effective communication systems for hearing or visually impaired individuals, such as TDD or TTY machines, video tapes with signing interpreters or briefing materials in braille, or provide an interpreter. PHAs are not required to take any actions that would result in an undue financial or administrative burden.

**Other Briefing Topics**

PHAs should use the briefing to communicate its message and any PHA-specific requirements. At a minimum, the PHA should give the family an overview of the contents of the briefing packet, so families are aware of the information contained in the packet and therefore more likely to refer to the packet during the housing search and leasing process. Below are topics that PHAs may wish to consider discussing in the briefing:

- Tips on how to find a suitable unit and family considerations when deciding whether to lease a unit, including unit condition, reasonableness of rent, cost of tenant-paid utilities, whether the unit is energy-efficient, and location of unit.

- Tips on how to negotiate a lease.

- Discussion of HQS, focusing on common reasons that units fail HQS during initial inspections.

- Discussion of significant aspects of applicable state and local laws, including fair housing laws.

- Information that will inform families of housing opportunities within the PHA's jurisdiction, particularly in low-poverty areas.

- Information on the quality of neighborhoods, including the availability of job opportunities, quality of schools, access to public transport, and other community services.

- Information on the availability of local community resources for which families can apply to compliment their housing assistance. This might include any services of financial assistance for security deposits and other moving costs. Effective use of these services and resources may help to prevent difficulties for the family during tenancy.

- Explanation of security deposit requirements. Families should be informed of three points:

1. *The cost of the security deposit is not covered under the housing choice voucher program.*

    Too often prospective housing choice voucher program families discover late in the housing search and leasing processes that they are responsible for paying the security deposit to the owner. Not having budgeted for this expense, the family fails to lease under the housing choice voucher program. This situation, which results in loss of time and money for the family, the PHA, and the owner, can be avoided by clearly explaining at the briefing that the family is responsible for any security deposit requested by the owner. Owners *may* collect a security deposit but are not required to do so, and amounts collected may vary. Some owners may agree to allow the family to pay the security deposit in installments over the term of the lease. Depending upon the housing market and jurisdiction, some PHAs may be able to give families a good indication of how much of a security deposit they can expect to pay for various types of units. These estimates can help the family better plan for this expense.

2. *The purpose of the security deposit.*

    When a participant moves out of the unit, the owner may use the security deposit and any interest accrued as reimbursement for any unpaid rent payable by the tenant, and damages to the unit or for other amounts the tenant owes under the lease. In most states, the owner must give the tenant a written list of all items charged against the security deposit and the amount of each item. After deducting any charges, the owner must promptly refund the full amount of the remaining balance to the tenant. If the security deposit is not sufficient to cover the amount the tenant owes under the lease, the owner may seek to collect the balance from the tenant. Rules governing security deposits are generally covered in state law.

3.  *The PHA's security deposit policy.*

    If applicable, the PHA should explain its security deposit policy. PHAs may choose to develop policies that limit the security deposit to no more than an amount commonly charged in the private market or to no more than the owner charges to unassisted tenants. Other than this, however, the PHA cannot place any restrictions on the security deposit amount charged by owners

## Contents of Briefing Packet

The information packet that families selected to participate in the housing choice voucher program receive at the briefing must include the following information:

-   Term of the voucher.

-   PHA policy on extensions or suspensions of the voucher term and procedures for requesting an extension.

-   Information on computing the housing assistance payment. PHAs must provide families with an explanation of the calculations that determine the maximum subsidy and how much rent a family will have to pay. It is impossible to tell a family exactly how much it will have to pay in rent and utilities until after the PHA approves the selected unit. This is because the family's share depends upon the amount the owner is charging for the selected unit. Nonetheless, it is very important that a family begin its housing search with a general understanding of how much it can afford and the maximum it will be allowed to pay in rent and utilities.

    The formulas for calculating rent and subsidy are complex. Explaining rent and subsidy terms and formulas as simply and clearly as possible should be a key concern. To help families narrow their search to units in an affordable price range, the PHA should provide a clear definition for each of the following terms at the briefing; then, the PHA should give each family the corresponding amount from the family's own income and rent calculation:

    -   *Total Tenant Payment (TTP).* The minimum amount a family will have to pay for rent and utilities. This figure is the greatest of: 30 percent of monthly adjusted income, 10 percent of monthly income, the welfare rent in as-paid states, or the PHA minimum rent (or special minimum rent for enhanced vouchers).

    -   *Maximum initial rent burden.* The maximum amount the family is allowed to pay for rent and utilities at initial leasing of a unit under the voucher program. If rent for the unit exceeds the PHA payment standard, this figure is 40 percent of monthly adjusted income.

    -   *Maximum subsidy.* The maximum amount the PHA will pay the owner on the family's behalf. This figure is obtained by subtracting the TTP from the payment standard.

The briefing package should clarify that, if the gross rent (rent plus utilities) for the unit selected is above the payment standard, the family share must be the Total Tenant Payment plus any amount the gross rent exceeds the payment standard. If this figure exceeds the maximum initial rent burden, the unit cannot be approved. If the amount of gross rent is below the payment standard, the subsidy is reduced accordingly. Exhibit 6-1 (see Chapter 6) contains a sample worksheet to help a family determine whether a unit it has selected is affordable and can be approved under the program.

- Information on the payment standard, including any exception payment standards, and the PHA's utility allowance schedule.

- Explanation of how the PHA determines the maximum rent for the unit (rent reasonableness).

- Explanation of portability.

- HUD tenancy addendum.

- The form for requesting tenancy approval and an explanation on how to request such approval.

- PHA policy on providing information about a family to prospective owners.

- PHA subsidy standards including any exceptions to these standards.

- HUD brochure on selecting a unit.

- Information on federal, state, and local equal opportunity laws and a copy of form HUD-903, Housing Discrimination Complaint Form.

- List of owners or others (e.g. real estate agents) who may agree to lease a unit to the family or help the family find a unit.

- Notice stating that, if the family includes a person with disabilities, the family may request a current listing of potentially available accessible units known to the PHA. The notice must also inform the family that it may request an exception payment standard when needed as a reasonable accommodation.

- Obligations of the family under the housing choice voucher program, including family obligations under the welfare-to-work voucher program, if applicable. See Section 8.4, Family Obligations.

- Grounds for which the PHA may terminate the family's assistance.

- Informal hearing process and how to request one.

- Map of the PHA's jurisdiction showing various areas with housing opportunities and other housing market information. Housing market information should not be limited to exception rent areas. In order to encourage deconcentration and promote housing opportunity, the PHA should provide housing market information, maps for other PHA jurisdictions in the same general market area, and a list of PHAs in neighboring jurisdictions including addresses, telephone numbers, and the name of the contact person for portability. Maps are particularly useful in urban areas to indicate the agency's jurisdiction, public transportation system, locations of employment opportunities, schools, hospitals, day care centers, shopping areas and other public facilities relevant to housing choice. *Note that making this information available to families is a requirement for SEMAP Indicator 7, Expanding Housing Opportunities.*

*Other Briefing Packet Items*

In addition to items required by the regulations, PHAs may wish to include supplemental materials to help explain the program to both participants and owners. Examples of supplemental materials for consideration include:

- Summary of the items included in the briefing packet. The amount of material in the information packet and its level of reading difficulty may make some families reluctant to use the packet as a resource. A concise written summary of the contents of each item included in the packet may make the packet more user-friendly and helpful to the family.

- Brochures to explain the housing choice voucher program to owners.

- Form HUD-52641, Housing Assistance Payments Contract for the Housing Choice Voucher Program.

- Description of the PHA's security deposit policy, if the PHA has one.

- Information on service organizations and utility companies.

- Explanation of rent reasonableness.

- Requirements for notifying the PHA of any changes in income.

- List of units known to be available for rent. Such a list is only useful if it is up-to-date. In smaller, less active rental markets, the PHA will be able to more easily maintain a rental list. The list should be made available to all families and should include units outside areas of low-income or minority concentration. Units placed on the list may be pre-inspected by the PHA to determine that they meet housing quality standards and rent reasonableness. If the units have not been approved, the PHA should emphasize to the family that the units are not pre-approved. In larger markets and areas with low vacancy rates, a list of owners who have indicated their interest in participating in the program may prove to be more useful since any identified vacant unit may be rented before its availability can be advertised to voucher holders.

- Explanation of any special programs or services offered by the PHA, such as family self-sufficiency.

- Checklist of items to consider before signing a lease.

- Contact information for PHA staff, local social service agencies (welfare and health agencies, legal assistance groups, fair housing organizations, tenant organizations, child care services, transportation services, utility companies, etc.).

- List of items that commonly fail HQS.

**Briefing Attendance, Length, Location, and Time**

Some PHAs require that all of the adults in each household attend the briefing, while other PHAs require attendance only by the head of household. The benefit of requiring all adult family members to attend the briefing is that it is the best guarantee that everyone is informed about the program, particularly family obligations and grounds for termination of assistance. Proponents of this approach argue that the likelihood of misreporting, fraud, and lease violations decreases when all adult members are successfully briefed. However, one major disadvantage of this approach is that it can create scheduling problems for both the PHA and the family. When a family member misses the briefing and must wait to reschedule, costly delays in issuance and leasing occur. Weighing the pros and cons of both approaches, PHAs must determine a policy that best meets their needs.

Families selected to participate in the housing choice voucher program may be briefed individually or in a group setting. There are advantages and disadvantages to both approaches, depending upon the amount of leasing activity that the PHA is experiencing, program size, jurisdiction size, family needs, and staffing levels.

The length of the briefing is an important consideration. On the one hand, the briefing covers a substantial amount of important information, including some topics that may be complex and confusing to a voucher holder who has limited program knowledge. Because of this, enough time should be allocated for the briefing to ensure that all topics are adequately covered. On the other hand, if the briefing is too long, the voucher holder will lose interest. One suggestion is to limit the briefing to no more than one hour. Briefings are often held during regular business hours at the PHA's central office, but they can be held anywhere at any time.

| GROUP BRIEFINGS | INDIVIDUAL BRIEFINGS |
|---|---|
| **Advantages** | |
| Allows the PHA to better control the workload distribution of its leasing staff so that it can allocate sufficient time to other leasing activities. | Families can be briefed immediately after they are selected and determined eligible, without having to wait for the next scheduled briefing. |
| Efficient method for briefing a large number of families as quickly as possible. | Individual attention helps to clarify search process and program requirements, increasing likelihood that the family will be successful in leasing up. |
| Increases likelihood that families receive a consistent message from the PHA. | More time can be spent explaining program benefits and encouraging families living in high-poverty census tracts to move to areas of low-poverty concentration. |
| Families can learn from others with similar problems and questions and can share ideas and experiences. | |
| Typically more appropriate for large programs, programs with aggressive leasing schedules, and programs with a heavy workload and limited staff. | Affords more privacy and tailoring to meet family's needs. |
| | Typically more appropriate for PHAs with limited leasing activity. |
| **Disadvantages** | |
| Often does not encourage or allow sufficient time for questions to be raised by families and answered by PHA staff. If group sessions are held, the PHA should allow time for one-on-one meetings to address individual questions and concerns following the briefing. | May spread leasing staff too thin if they are conducting too many individual briefings, decreasing their ability to complete other important processing functions. |
| | Increases likelihood of inconsistency in information if more than one person is conducting the individual briefings. |
| May slow the leasing process if families must wait to be briefed. | |
| The larger the group, the less effective the briefing. | |

---

**CONSIDERATIONS FOR DETERMINING BRIEFING LOCATION AND TIME**

- Is the PHA central office easily accessible, or would it be more convenient for the client if the briefing was offered at another public site, such as a local community center, church, or public housing site?

- Are there families with special needs that may require the briefing to be scheduled at some other location, such as the applicant's home or another PHA office?

- Is the geographical area large enough to make it more practical to hold briefings at various sites throughout the jurisdiction?

- Are there working families who may find it more convenient to attend an early morning, evening, or weekend briefing?

## 8.3   VOUCHER ISSUANCE

**Introduction**

The Housing Choice Voucher, form HUD-52646, is the family's authorization to search for housing. It can be issued to the family only after the PHA has selected the family from the waiting list (except for a special admission) and determined its eligibility. The voucher specifies the unit size for which the family qualifies. This unit size may also be used to determine the amount of assistance the PHA will pay to the owner on behalf of the family. The voucher includes both the date of voucher issuance and date of expiration. It contains a brief description of how the program works and explains the family obligations under the program. The PHA issues a voucher to the family after the family has been briefed on program requirements. The voucher is evidence that the PHA has determined the family to be eligible for the program and plans to subsidize the family if the family selects a unit that can be approved under program requirements. The PHA is under no obligation to either the family or the owner to approve any specific unit, but the voucher is a contractual agreement between the PHA and the family, obligating the PHA to provide assistance if the family locates an approvable unit and complies with the family obligations.

The PHA must have sufficient funds to house an applicant before issuing a voucher. If funds are insufficient to house the family at the top of the waiting list, the PHA must wait until it has adequate funds through vouchers turning over before it calls another family from the list.

The PHA must issue enough vouchers to:

- Meet its leasing schedule when a new allocation is received;

- Replace vouchers that have been issued but have expired; and

- Account for families who have left the program, thereby making vouchers available for use by new families.

Regardless of the number of outstanding vouchers, the PHA must always issue a voucher if necessary to move an overhoused or overcrowded participating family or a participating family living in unsafe housing where the owner refuses to make repairs.

Before issuing a voucher for admission to the program, the PHA must re-verify income if the family's income has changed or any income verification is more than 60 days old. This may require the PHA to delay voucher issuance and briefing.

The family must date and sign the voucher. It is recommended that the PHA retain a copy of the voucher in the family's file.

After initial lease-up, the PHA must maintain an occupancy rate of at least 95 percent of the contracted units. A PHA must have a lease-up rate of 98 percent to receive maximum points under SEMAP.

**Overissuance**

PHAs may want to consider issuing more vouchers than could be supported under its ACC if all of the vouchers resulted in HAP contracts. This is referred to as overissuing and is done to improve lease-up rates. By overissuing, a PHA can compensate for the number of issued vouchers that will not result in the execution of a HAP contract.

Approval from HUD is not necessary to deviate from the number of units contracted if the annual budget authority amount under the ACC can support the additional units.. However, no funds may be used from the PHA's ACC program reserve account to support new HAP contracts that exceed budgeted funds (see Chapter 20). While overissuing is a useful tool for improving and maintaining a high leasing rate, it requires the PHA to closely monitor and track voucher success rates. Only with good success rate data can a PHA judge the degree it can overissue without committing itself to more units than can be assisted using the PHA's available annual budget authority. See Section 8.13 below.

**When to Issue**

The PHA may decide whether to issue the voucher independently or in conjunction with the briefing session. Many PHAs find it useful to satisfy both of these requirements at once. Issuing the voucher immediately after the briefing session is an efficient use of staff time and also limits the number of times the family must return to the PHA office to complete paperwork.

**8.4    FAMILY OBLIGATIONS**

As discussed above, the PHA must inform families at the briefing of their obligations under the program, and the briefing information packet must contain the same information. Form HUD-52646, Housing Choice Voucher, lists these obligations. Once the unit is approved and the HAP contract is executed, the family must follow the rules listed on the voucher in order to continue participating in the housing choice voucher program. All information the family provides must be accurate and complete. The voucher also clearly specifies activities in which the family must NOT engage. Exhibit 5-4 in Chapter 5 describes the family obligations.

**8.5    SEARCH TIME, EXTENSIONS, AND VOUCHER EXPIRATIONS**

The PHA must issue a voucher for an initial period of at least 60 days. The term must be clearly indicated on the voucher, and the family must submit its request for tenancy approval within the specified period, unless the PHA grants an extension.

**Extensions of Search Time**

The PHA has the authority to grant extensions of search time and to determine the length of an extension and the circumstances under which extensions will be granted. If the PHA grants an extension, it must provide written notice to the family. There is no limit on the number of extensions that the PHA can approve. Discretionary policies related to extension and expiration of search time must be described in the PHA's administrative plan.

PHAs must approve an additional search term if needed as a reasonable accommodation to make the program accessible to and usable by a person with disabilities. The extension period must be reasonable for the purpose.

When establishing PHA policy on the *length* of the extension, consider the following:

- *How tight is the local housing market*? For example, a PHA located in a tight housing market may wish to automatically extend the voucher period whenever an extension is requested due to the likelihood that it will take voucher holders longer to locate decent housing renting for amounts that can be approved by the program. A PHA located in a housing market where the supply of affordable units exceeds the demand may choose not to grant extensions except in special circumstances.

- *What is the approximate wait time for an applicant on the waiting list*? If the wait is long and there are many potentially eligible applicants waiting for a voucher, PHAs may wish to grant extensions only to those voucher holders who have demonstrated that they have made substantial effort to locate housing or to those with extenuating circumstances.

When determining *who should receive* extensions, consider the following:

- The family's level of effort to find a suitable unit during the initial term. Did the family contact owners and real estate companies, search newspaper listings, explore neighborhoods for "For Rent" signs, check with local churches, and other community organizations?

- Whether there is a reasonable possibility that the family may, with additional advice and assistance, find a suitable unit;

- Level of support services requested by and provided to the family;

- Extenuating circumstances that prevented the family from finding a unit, such as:

  - Serious illness in the family;
  - Death in the family;
  - Family emergency;
  - Obstacles due to employment;

- Whether the family has already submitted requests for approval of the tenancy for units that were not approved by the PHA; and

- Whether family size or other special requirements made finding a unit difficult.

The PHA may request a report or update from the family on its progress leasing a unit during the initial or extended search term. Exhibit 8-1, *Housing Search Progress Report,* contains a sample housing search progress report.

## Voucher Term Expiration

It is good practice to clarify to families that the housing choice voucher term expiration pertains to the deadline for submission of a request for tenancy approval. The expiration date does not refer to the date the unit must be available for occupancy. For example, if a housing choice voucher term expiration date is June 15, the request for tenancy approval could be dated June 15 for an occupancy date of August 1.

When a family's housing choice voucher term expires with or without an extension, the PHA has the authority to establish a policy for handling these families. This policy must be included in the PHA's administrative plan. The PHA may:

- Require that the family reapply when the PHA begins accepting applications; or

- Place the family on the waiting list with a new application date without requiring it to reapply.

The PHA may not determine the family to be ineligible for the program on the grounds that it was not able to lease up.

## Suspension of Search Time

At its discretion, a PHA may adopt a policy to suspend the housing choice voucher term if the family has submitted a request for tenancy approval during the voucher term. "Suspension" means stopping the clock on a family's voucher term when a family submits the request for tenancy approval until the time the PHA approves or denies the request. This suspension of time is also called "tolling". Court decisions in some states have required that PHAs permit tolling.

The PHA's policy on suspending housing search time must be included in its administrative plan.

---

TOLLING EXAMPLE

Voucher Issued: May 1        Family Submits Request for Tenancy Approval: May 15

Expiration Date: June 29      PHA Denies Unit: May 24

Tolling Time: 9 Days (May 16-24)
New Voucher Expiration Date: July 8 (June 29 + 9 days)

---

**Fair Housing Requirements**

If a family believes it has been discriminated against in its search for housing on the basis of race, color, religion, sex, national origin, age, familial status, or disability, it may file a housing discrimination complaint with any HUD Field Office of Fair Housing and Equal Opportunity. Each briefing packet must include the housing discrimination complaint form, form HUD-903, and the PHA must provide the family with information on how to fill out and file a housing discrimination complaint.

## 8.6 ASSISTANCE TO FAMILIES DURING THE HOUSING SEARCH

One notable method for improving leasing success rates is to provide assistance to families during the housing search process. A PHA's goal is to keep the number of vouchers that are issued but never result in a HAP contract to a minimum. Periodic contact with voucher holders during the search process has proven to be an effective method to improve leasing success. Such contact allows the PHA to assess the family's progress in locating units and to resolve any issues and clarify program requirements before the expiration of the voucher term. The PHA can also use this communication with the participants to remind them of the expiration date of the voucher and to reinforce the importance of locating a unit and returning a request for tenancy approval or requesting an extension prior to the date of expiration.

Depending upon an agency's leasing status and the availability of funds and staff, other services that a PHA may wish to provide to families include:

- Briefings and information on neighborhoods and amenities in non-impacted areas of the PHA's jurisdiction;

- Transportation to visit units in non-impacted areas;

- Neighborhood tours;

- Counseling services/search assistance;

- Baby-sitting to enable parents to search for units;

---

- Listings of vacant rental units, particularly those in non-impacted areas; and

- Loans or financial assistance to pay for security deposits, utility deposits, and moving costs.

## 8.7   REQUEST FOR TENANCY APPROVAL

Once a family finds a suitable unit and the owner is willing to lease the unit under the program, the family must request tenancy approval from the PHA. The family must submit two documents to the PHA: a request for tenancy approval and an unexecuted copy of the lease, including the HUD-prescribed tenancy addendum. The family must submit both documents no later than the expiration date stated on the voucher.

The PHA has the discretion to specify the procedure for requesting tenancy approval, and the family must submit the request for tenancy approval in the form and manner required by the PHA. PHAs must use form HUD-52517, Request for Tenancy Approval, for this purpose. Form HUD-52517 contains basic information about the rental unit selected by the family, including the unit address, number of bedrooms, structure type, year constructed, utilities included in the rent, and the requested beginning date of the lease. Owners must certify the most recent amount of rent charged for the unit and provide an explanation for any difference between the prior rent and the proposed rent. Owners must also certify that they are not the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has granted a request for reasonable accommodation for a person with disabilities who is a member of the tenant household. Finally, for units constructed prior to 1978, owners must either 1) certify that the unit, common areas, and exterior have been found to be free of lead-based paint by a certified inspector; or 2) attach a lead-based paint disclosure statement.

Some PHAs find it more practical to use the phone to take down the primary information needed to begin processing the tenancy approval from the family and owner. This method may work best for small PHAs and in instances where the owner has been a past participant on the program and is in good standing. This method allows the PHA to schedule its unit inspection more quickly. Prior to execution of the assisted lease and HAP contract, however, the PHA must obtain a written request and ensure that the information is accurately recorded.

The PHA has the discretion to permit a family to submit more than one request for tenancy approval at a time.

## 8.8   PHA APPROVAL OF THE TENANCY

Before approving the assisted tenancy and executing the HAP contract, the PHA must ensure that the following program requirements have been met:

- Unit is eligible.

- Unit has been inspected by the PHA and meets HQS. (See Chapter 10.)

- Lease includes the tenancy addendum.

- Rent charged by owner is reasonable. (See Chapter 9.)

The following actions must be completed before the beginning of the lease term:

- The PHA must inspect the unit and determine that the unit meets HQS. (See Chapter 10.)

- The owner and the tenant must have executed the lease, including the HUD-prescribed tenancy addendum.

- The PHA must assure that there are no conflicts of interest and that the owner can be approved.

- For families receiving housing choice voucher program assistance for the first time, and where the gross rent of the unit exceeds the applicable payment standard for the family, the PHA must ensure that the family share does not exceed 40 percent of monthly-adjusted income. This cap is referred to as the maximum initial rent burden.

---

MAXIMUM INITIAL RENT BURDEN

TTP: $210          40 percent Adjusted Income: $280
Gross Rent: $650   Payment Standard: $550

Amount Gross Rent Above Payment Standard (650-550): $100
Family Share ($210 + $100): $310

$310 Exceeds 40 percent of Adjusted Income ($280).
Outcome: Family cannot rent the unit.

---

**Eligible Units**

The tenancy cannot be approved if the chosen unit is one of the following:

- Public or Indian housing unit;

- Unit receiving Section 8 project-based assistance. This includes units in Section 23 leased housing; Section 8 new construction, substantial rehabilitation, moderate rehabilitation, loan management, or property disposition; and Rural Housing Service and Section 202 projects with Section 8 subsidies or Rural Housing Service rent supplements;

- Nursing homes, board and care homes, or facilities providing continual psychiatric, medical or nursing services;

- College or other school dormitories;

- Units on the grounds of penal, reformatory, medical, mental, and similar public or private institutions;

- Unit occupied by its owner or by a person with interest in the dwelling unit. However, assistance may be provided to a family residing in a cooperative or to an owner of a manufactured home leasing a manufactured home space. (See Chapter 17 for special rules related to cooperatives, manufactured home space rental, and shared housing.)

Units owned or substantially controlled by the PHA administering the ACC for the housing choice voucher may be leased under the housing choice voucher program only if the following conditions are satisfied:

- Unit is not ineligible housing, as described above; and

- PHA informs the family, both orally and in writing, that the family has the right to select any eligible unit available for lease, and the family selects the PHA-owned unit freely, without PHA pressure or steering.

For the tenancy to be approved, the unit size must also be appropriate for the number of persons in the household. The following rules apply:

- Regardless of the number of bedrooms stated on the voucher issued to the family, the PHA must allow the family to rent an otherwise acceptable unit even if it is larger than the family needs.

- Similarly, the PHA must allow the family to rent an otherwise acceptable unit that is smaller than the size indicated on the family's voucher, as long as the unit meets HQS space standards, i.e. no more than two persons per living/sleeping room. (See Chapter 10.)

- The payment standard for the family is always the lower of the payment standard for the unit size listed on the voucher or the payment standard for the size of the unit rented by the family.

**Unit Meets HQS**

The PHA must determine that the rental unit selected is in decent, safe, and sanitary condition before approving the tenancy. This determination is made using HUD's Housing Quality Standards (HQS) and/or equivalent state or local standards approved by HUD. The PHA must notify the family and owner of its determination as to whether the unit meets HQS. For PHAs with 1,250 or fewer budgeted housing choice voucher units, the notice to the family and owner must be made within 15 calendar days after the family and owner submit the request for tenancy approval. The 15-day clock is suspended during any period when the unit is not available for inspection. For PHAs with more than 1,250 budgeted housing choice voucher units, the notice to family and owner must be made within a reasonable time after the family and owner submit the request for tenancy approval. (See Chapter 10.)

**Rent Reasonableness**

Prior to tenancy approval, the PHA must make a rent reasonableness determination by comparing the rent being charged by the owner to rents for comparable unassisted units in the area and to rents being charged by the owner for comparable, unassisted units on the premises. (See Chapter 9.)

If the proposed rent is determined to be too high and does not meet the rent reasonableness limitation, the PHA should engage in negotiations with the owner and attempt to reduce the contract rent or to include some or all of the utilities in the contract rent. It is often in the PHA's best interest to make its best effort to approve the tenancy and execute a lease and HAP. Starting over increases time and money spent on the leasing process and may increase frustration for all parties.

**Notification to Owner and Family**

After receiving the family's request for tenancy approval, the PHA must promptly notify the family and owner whether the assisted tenancy is approved. If the PHA approves the tenancy, the owner and the PHA execute the HAP contract. (See Chapter 11.) If the PHA determines that the assisted tenancy cannot be approved for any reason, the PHA must notify the owner and family and provide the reasons for disapproval. The PHA must also provide the owner and family with an opportunity to correct the problem(s) prior to a specific date established by the PHA.

**8.9     PHA DISAPPROVAL OF OWNER**

**Owners Disapproved by HUD**

The PHA must not approve the assisted tenancy if HUD or another party has informed the PHA that the owner is debarred, suspended, or subject to a limited denial of participation. "Owner" includes a principal or other interested party.

In addition, the PHA must not approve the assisted tenancy when it has been informed by HUD that:

- The federal government has instituted an administrative or judicial action against the owner for a violation of the Fair Housing Act or other federal equal opportunity requirements and such action is pending; or

- A court or administrative agency has determined that the owner violated the Fair Housing Act or other federal equal opportunity requirements.

**Leases Between Relatives**

The PHA must not approve the tenancy if the owner of the unit is the parent, child, grandparent, grandchild, sister, or brother of any member of the assisted family, unless approving the tenancy would provide reasonable accommodation for a family member who is a person with disabilities. This restriction only applies at the time the family initially receives housing choice voucher assistance for occupancy of a particular unit, but does not apply to a unit currently under an assisted lease.

**Conflicts of Interest**

PHAs must also not approve contracts in which any of the following parties have a current interest or will have an interest in the HAP contract for one year thereafter:

- Present or former member or officer of the PHA, except a participant commissioner;

- Employee of the PHA or any contractor, subcontractor or agent of the PHA who formulates policy or influences program decisions;

- Public official, member of a governing body, or state or local legislator who exercises functions or responsibilities related to the programs; or

- Members of U.S. Congress.

The HUD Field Office may waive the conflict of interest requirements, except for members of Congress, for good cause.

**PHA Discretion to Disapprove Owners**

A PHA may adopt a policy of disapproving owners for any of the specific reasons listed below. The PHA's policy must be clearly stated in its administrative plan. The reasons include:

- Violation of obligations under one or more HAP contracts;

- Acts of fraud, bribery or any other corrupt or criminal act in connection with any federal housing program;

- Participation in any drug-related criminal activity or any violent criminal activity;

- Current or previous practice of non-compliance with HQS and/or state and local housing codes or with applicable housing standards for units leased under any other federal housing program;

- Current or prior history of refusing to evict housing choice voucher program or other assisted housing tenants for activity by the tenant, any member of the household, a guest, or another person under the control of any member of the household that:

- Threatens the right to peaceful enjoyment of the premises by other residents;

- Threatens the health or safety of residents, PHA employees, of owner employees;

- Threatens the neighbors' health or safety, or neighbors' right to peaceful enjoyment of their residences; or

- Engages in drug-related criminal activity or violent criminal activity; and

• Fails to pay state or local real estate taxes, fines, or assessments.

When the PHA decides not to execute HAP contracts with an owner for reasons described in the PHA's administrative plan, the decision affects only prospective (future) contracts. Participants residing in units belonging to the identified owner must not be asked to move solely because of a decision to disapprove the owner.

## 8.10   TENANT SCREENING

Tenant screening and selection are the responsibility of the owner. At or before tenancy approval by the PHA, the PHA must inform the owner of this responsibility. PHAs are required to give the owner the following information:

• Current and prior address of the prospective housing choice voucher tenant, as recorded by the PHA; and

• Name and address, if known to the PHA, of the prospective tenant's current and prior landlord.

The PHA may adopt a policy of offering owners other information it has about a family, including tenancy and drug trafficking information. The PHA's policy must also be included in its administrative plan and in the information packet that the family receives at the briefing. The PHA must provide the same types of information to all families and to all owners. The policy must not violate any state or local laws.

The PHA should encourage owners to consider a family's background with respect to such factors as:

• Payment of rent and utilities;
• Care of unit and premises;
• Respect for the rights of other residents to the peaceful enjoyment of their housing;
• Drug-related criminal activity or other criminal activity that threatens the health, safety, or property of others; and
• Compliance with other essential conditions of tenancy.

Although tenant screening and selection remain the function of the owner, PHAs may opt to screen for family behavior or suitability for tenancy. (See Chapter 5.)

## 8.11 LEASE AND TENANCY

The tenant must have legal capacity to enter into a lease under state or local law. "Legal capacity" means that the tenant is bound by the terms of the lease and may enforce the terms of the lease against the owner.

The tenant and the owner must enter and execute a written lease for the unit. The lease must be in the standard form the owner uses in the locality for rental to unassisted tenants. The HAP contract prescribed by HUD contains the owner's certification that, if the owner uses a standard lease form for rental to unassisted tenants, that lease form is used for the assisted unit as well. If the owner does not use a standard form of lease to unassisted tenants, another form of lease may be used.

The lease must include the following information:

- Names of the owner and tenant;

- Unit address;

- Term of the lease, including initial term and provisions for renewal;

- Amount of monthly rent to owner;

- Specification of what utilities and appliances the owner must supply and what utilities and appliances the family must supply.

The lease must also include verbatim the HUD-prescribed tenancy addendum. The tenancy addendum can also be found in Part C of the HAP Contract for the Housing Choice Voucher Program. The tenancy addendum sets forth the tenancy requirements for the program and the composition of the household, as approved by the PHA. The owner must sign the lease and HUD tenancy addendum with the prospective tenant; the tenant has the right to enforce the tenancy addendum against the owner. The terms of the tenancy addendum prevail over any other provisions of the lease.

The PHA's role in reviewing the lease is limited. The PHA may review the lease to determine compliance with state and local law and may deny the request for tenancy if it determines noncompliance. If the owner does not use a standard lease form, PHAs may encourage the owner to obtain a standard form from a local realtor or other reliable source. The use of a model lease provided by the PHA should be limited to those rare cases where the owner cannot locate an acceptable standard form. If a PHA-provided model lease is used, it should not refer specifically to the PHA or the housing choice voucher program.

It is important that the family and owner understand the terms of the lease and HAP contract documents. Once the documents are prepared, some PHAs schedule a joint meeting with the family and owner to review these documents. In addition to reviewing the specific terms of the lease and contract, the PHA can use this meeting to clarify owner requirements for participating in the program, reinforce tenant requirements for participating in the program, clarify points of contact within the PHA, and answer any questions or respond to any comments or concerns.

## 8.12    TERM OF ASSISTED TENANCY

The initial lease term must be for at least one year, except that the PHA may approve a shorter term if that would improve housing opportunities for the tenant and is the prevailing local market practice. During the initial lease term, the owner may not raise the rent to owner, except when permitted by special rules for subsidized units. The PHA may approve the tenancy and execute a HAP contract even if there is less than one year remaining from the beginning of the lease term and the end of the last expiring funding increment under the consolidated ACC. The lease must include provisions for its renewal.

The lease term runs concurrently with the HAP contract term. If the lease terminates, the HAP contract terminates. Whenever the owner elects to execute a new lease, a new HAP contract is also required.

The term of the new lease or contract for a new unit may begin in the same month in which the participant moves out of his/her previous assisted unit. This is not considered a duplicative subsidy.

## 8.13    MAINTAINING DATA ON ISSUANCE, SEARCH TIME AND SUCCESS RATES

A PHA must meet its leasing schedule for any new increments of units and maintain a leasing rate of at least 95 percent of the number of units under ACC. To meet these requirements, a PHA must regularly monitor housing choice voucher issuance and its families' success in leasing units. Regular monitoring ensures that estimates regarding the number of housing choice vouchers to issue are as accurate as possible. It can also help to identify trends, challenges, and the effects of factors such as seasonal variances in the rental market or PHA administrative and policy decisions on a family's ability to lease a unit.

---

WHY TRACK THE HOUSING SEARCH AND LEASING PROCESS?

- To determine why housing choice voucher holders are not successful and make necessary changes and improvements to remedy problems.

- To determine the ratio of vouchers issued to units leased.

---

Tracking housing choice voucher issuance begins with a good numbering system. HUD does not specify a system for tracking and numbering vouchers. For the regular housing choice voucher program, PHAs must be able to report leasing activity for the entire program and not by funding

increment. A PHA's tracking system, however, should be able to separately track leasing activity for special programs. While automated systems are most efficient and accurate, a manual system may suffice, depending upon the size of the PHA and the number of vouchers issued annually. It is important that staff responsible for monitoring the lease-up process understand how the tracking systems work.

---

OPTIONS FOR NUMBERING VOUCHERS

**Number system reflects the unit allocation.** For example, for a PHA with 50 Section 8 units, the vouchers are numbered one through 50. Subsequent use of a voucher is recorded using a numeric or alphabetic code. For example, the fifth time the voucher number 20 is used would be coded as 20-5.

**Sequential numbering system.** Each time a voucher is issued or re-issued it is assigned the next available number. This method requires that a system be developed to track the number of "active" vouchers at any given time.

**Numbering System that tracks individual allocations.** The voucher can be tracked according to the project number or year the allocation was made. For example, vouchers allocated in year 2000 would be numbered 2000-1, 2000-2, 2000-3, etc.

---

By keeping track of vouchers that are issued, extended and expired, a PHA can ensure that it reissues a voucher to the next eligible applicant on the waiting list as soon as it becomes available. The key to success is determining as accurately and quickly as possible the number of vouchers to issue and understanding that this number may change at any given time.

---

ACHIEVING LEASING GOALS
KEY FACTORS FOR ANALYSIS

- Total unit allocation under the housing choice voucher program
- Number of units currently available
- Percent of vouchers issued that result in HAP contracts
- Percent of vouchers issued that do not result in HAP contracts
- Number of voucher extensions and average time of extension
- Number of program terminations

---

Chapter 24 provides additional information on monitoring voucher utilization.

## EXHIBIT 8-1
## HOUSING SEARCH PROGRESS REPORT

| UNIT ADDRESS | HOW FOUND (NEWSPAPER, FOR RENT SIGN, WORD OF MOUTH, ETC.) | NAME/NUMBER OWNER OR MGMT AGENT | DATE CONTACTED | UNIT SEEN YES / NO | OUTCOME |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |